**Student No. 26-10536**

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

Ellen Mae Fisher,

Plaintiff - Appellant

v.

Texas Tech University Regents; Dean Jack Wade Nowlin, Dean and W. Frank Newton Professor of Law at the School of Law; Jared Gonzales, In his individual and official capacity as Dean of the Texas Tech School of Law; Larry Spain, Alvin R. Allison Professor of Law and Director of the Clinical Programs and Civil Practice Clinic at the School of Law; Amy Hardberger, George W. McCleskey Professor of Water Law and Director of the Center for Water Law and Policy at the School of Law; Allison Outenreath, Associate Dean for Faculty Development, and the Erwin and Elaine Davenport Endowed Professor of Law at the School of Law; Ally Owens, Student member of the School of Law Honor Council; Terri Morgeson, In their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council; Cody Campbell, Chairman of the Regents; Dustin Womble, Vice Chairman of the Regents; Arcilia Acosta, Member of the Regents; Pat Gordon, Member of the Regents; Clay C. Cash, Member of the Regents; Tim Culp, Member of the Regents; Shelly Sweatt, Member of the Regents; Doug McReaken, Member of the Regents; Donald Sinclair, Member of the Regents; Eli Heath, Member of the Regents; William Keffer; Texas Tech University System Board of Regents,

Defendants - Appellees

**On Appeal from**

United States District Court for the Northern District of Texas

5:26-CV-73

# BRIEF OF PLAINTIFF-APPELLANT ELLEN FISHER

SUBMITTED BY:

Michael Thad Allen
Allen Harris, P.L.L.C.
P.O. Box 404
Quaker Hill, CT 06375
(860) 772-4738
mallen@Allenharrislaw.com

*Counsel for Plaintiff-Appellant*

## Certificate of Interested Persons

A CERTIFICATE OF INTERESTED PERSONS IS REQUIRED BY 5TH CIR. R. 28.2.1.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| **Appellees:** | **Counsel for Appellees:** |
|---|---|
| Arcilia Acosta | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Arcilia Acosta | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Cody Campbell | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Cody Campbell | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Clay Cash | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Clay Cash | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Tim Culp | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Tim Culp | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Jared Gonzales | Daniel Ortner of Office of the Texas Attorney General Austin, TX |

| | |
|---|---|
| Jared Gonzales | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Pat Gordon | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Pat Gordon | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Amy Hardberger | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Amy Hardberger | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Eli Heath | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Eli Heath | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| William Keffer | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| William Keffer | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Doug McReaken | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Doug McReaken | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Terri Morgeson | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Terri Morgeson | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Jack Nowlin | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Jack Nowlin | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Allison Outenreath | Daniel Ortner of Office of the Texas Attorney General Austin, TX |

| | |
|---|---|
| Allison Outenreath | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Ally Owens | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Ally Owens | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Donald Sinclair | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Donald Sinclair | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Larry Spain | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Larry Spain | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Shelly Sweatt | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Shelly Sweatt | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Texas Tech University Regents | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Texas Tech University Regents | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Texas Tech University System Board of Regents | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Texas Tech University System Board of Regents | Wade Johnson of Office of the Texas Attorney General Austin, TX |
| Dustin Womble | Daniel Ortner of Office of the Texas Attorney General Austin, TX |
| Dustin Womble | Wade Johnson of Office of the Texas Attorney General Austin, TX |

| **Appellants:** | **Counsel for Appellants:** |
| --- | --- |
| Ellen Fisher | Mark Mansfield Hurst, TX |
| Ellen Fisher | Michael Allen of Allen Harris, P.L.L.C. Quaker Hill, CT |

| **Other Interested Parties:** | **Counsel for Interested Parties:** |
| --- | --- |
| Texas Attorney General's Office | Daniel Ortner |
| Attorneys of the firm Allen Harris PLLC | Michael Thad Allen |

/S/Michael Thad Allen
Attorney of record for Plaintiff-Appellant Ellen Mae Fisher

## STATEMENT REGARDING ORAL ARGUMENT REQUIRED BY FIFTH CIRCUIT RULE 28.2.3

By order of this Court on June 30, 2026, oral argument in this case has been set for November 2, 2026 at 4:30 p.m., (Doc. No. 34-1)

Plaintiff-Appellant Ellen Fisher's appeal presents substantial questions of federal constitutional law concerning the scope of prospective relief available under *Ex parte Young,* 209 U.S. 123 (1908), in the context of university/educational discipline.

The lower court's jurisdictional ruling conflicts with this Court's own precedent in *Scott v. Flowers*, 910 F.2d 201 (5th Cir. 1990), and the overwhelming weight of persuasive precedent from other circuit courts of appeals. This precedent indicates that the expungement of an already-issued reprimand or other disciplinary record is proper prospective relief for First Amendment retaliation.

The district court distinguished *Flowers* on the ground that it was "not bound by implicit jurisdictional assumptions made in earlier cases." This would create new law that will unsettle decades of settled *Young* jurisprudence and deprive students targeted for their speech of any meaningful remedy.

Oral argument will assist the Court in reconciling these authorities and clarifying the boundaries of its First Amendment jurisprudence.

# TABLE OF CONTENTS

## BRIEF FOR APPELLANT-PLAINTIFF
## ELLEN MAE FISHER

Certificate of Interested Persons ............................................................ii

Statement Regarding Oral Argument Required by Fifth Circuit Rule 28.2.3.... vi

Table of Contents.......................................................................................vii

Table of Authorities ......................................................................................ix

Jurisdictional Statement Required by Fed. R. App. P. 28(a)(4)(A-D) .............xiv

Issues Presented for Review .........................................................................xvi

I. Plaintiff-Appellant's Statement of the Case ............................................ 1

II. Summary of the Argument ............................................................. 17

III. Argument................................................................................ 20

A. Legal Standard on Appeal ....................................................... 20

1) Standard for Granting a Preliminary Injunction .................... 20

2) Standard For Appellate Review of Denied Preliminary Injunction ................................................................................ 22

B. This Court Already Established Annulment/Expungement of a Reprimand as Prospective Relief for First Amendment Retaliation 23

C. Expungement Specifically Protects against Unfair Prejudice in Bar Proceedings ................................................................... 29

D. *Green Valley* Also Indicates an Injunction Is Warranted ....... 31

E. Injury to Fisher's First Amendment Rights Is *Per Se* Irreparable ............................................................................ 35

F. Plaintiff Will Succeed on the Merits Regardless of Forum..... 37

1) Viewpoint Discrimination Is Illegal in Any Forum ................. 37

2) The First Amendment Cannot Be Canceled to Prevent Hypothetically Hurting Others' Subjective Feelings or Even Actually Hurting Others' Subjective Feelings ................................ 43

3) Suppression of Fisher's Speech Is Subject to Strict Scrutiny . 46

4) Defendants Flunk the Strict Scrutiny Test ............................. 51

5) Even if the Court Considers the Clinic Office or Professors' Offices to Be a "Limited Public Forum," Fisher Still Prevails ....... 52

G. Fisher Suffered Adverse Action ................................................ 54

H. Fisher Spoke on a Matter of Public Concern ........................... 56

I. The Balance of Interests Favors a Preliminary Injunction .... 59

IV. Conclusion ........................................................................... 60

CERTIFICATE OF SERVICE ................................................................ 63

# TABLE OF AUTHORITIES

***Cases***

*Beckerman v. Tupelo*, 664 F.2d 502 (former 5th Cir. 1981) ____________ 43

*BNSF Ry. Co. v. Fed. R.R. Admin.*, 105 F.4th 691 (5th Cir. 2024) _ 24, 25

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024) ______________ 36

*Burch v. Barker*, 861 F.2d 1149 (9th Cir. 1988) ______________________ 26

*Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966) ______________________ 39

*Byrum v. Landreth*, 566 F.3d 442 (5th Cir. 2009) ____________________ 22

*Chiles v. Salazar*, __ U.S. __, 146 S. Ct. 1010 (2026) _______________ 57, 58

*Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330 (5th Cir. 2001) _____ 46, 52

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661 (2010) ____________________________________________________ 40

*Cohen v. California*, 403 U.S. 15 (1971) ___________________________ 58, 59

Co*rnelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788 (1985) __ 42, 46

*Daniels Health Scis., LLC v. Vascular Health Scis*., LLC, 710 F.3d 579 (5th Cir. 2013) _____________________________________________ 22, 29

*Direct Biologics, L.L.C. v. McQueen*, 63 F.4th 1015 (5th Cir. 2023) ___ 22

*Doe v. Cummins*, 662 F. App'x 437 (6th Cir. 2016) ___________________ 30

*Doe v. Lawrence Livermore Nat'l Lab*., 131 F.3d 836 (9th Cir. 1997) _ 26

*Doe v. Purdue* Univ., 928 F.3d 652 (7th Cir. 2019) ___________________ 31

*Elliott v. Hinds*, 786 F.2d 298 (7th Cir.1986) __________________________ 27

*Elrod v. Burns*, 427 U.S. 347 (1976) _____________________________________ 35

*Ex parte Young*, 209 U.S. 123 (1908) ______________________________ passim

*Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007) ____________________ 25

*Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417 (5th Cir. 2020)__________________________________________________ 47, 50, 52

*Gay Student Servs. v. Tex. A & M Univ.*, 737 F.2d 1317 (5th Cir. 1984) _____________________________________________________________ 38

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) __________ 47

*Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020)__________________________________________________ 31, 32, 33

*Healy v. James*, 408 U.S. 169 (1972) _______________________ 37, 38, 39

*Heilrayne v. Univ. of Tex.*, No. 1:25-cv-640-DAE, 2026 U.S. Dist. LEXIS 47701 (W.D. Tex. Jan. 27, 2026) _______________________________ 28

*Hobbs v. Hawkins*, 968 F.2d 471 (5th Cir. 1992)____________________ 42

*ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586 (5th Cir. 2003)_________________________________________________________ 22

*Jackson v. Wright*, 82 F.4th 362 (5th Cir. 2023) ____________________ 17

*Jackson v. Wright*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684 (E.D. Tex. Jan. 18, 2022) ____________________________________ 17

*Jensen v. Brown*, 131 F.4th 677 (9th Cir. 2025) _________________25, 26

*Justice for All v. Faulkner*, 410 F.3d 760 (5th Cir. 2005) _________47, 48

*K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) _______________________ 28

*Kershaw v. Shalala*, 9 F.3d 11 (5th Cir. 1993) ______________________ 25

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) ________________38, 41

*MacRae v. Mattos*, __ U.S. __, 145 S. Ct. 2617 (2025) _______________ 41

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) ____________________ 35, 38, 54

*Malkan v. Mutua*, No. 12-CV-236-A, 2012 U.S. Dist. LEXIS 143311

(W.D.N.Y. Oct. 3, 2012) 27

*Matos v. Clinton Sch. Dist.*, 367 F.3d 68 (1st Cir. 2004) 27

*McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021) 35, 59

*Minn. Voters All. v. Mansky*, 585 U.S. 1 (2018) 48

*Morgan v. Bd. of Prof'l Responsibility of the Supreme Court of Tenn.*, 63 F.4th 510 (6th Cir. 2023) 29, 30

*NAACP v. Button*, 371 U. S. 415 (1963) 57

*NRA of Am. v. Vullo*, 602 U.S. 175 (2024) 54

*Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279 (5th Cir. 2012) 35, 36

*Papasan v. Allain*, 478 U.S. 265 (1986) 32

*Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667 (1973) 34, 45, 55

*Planned Parenthood v. Sanchez*, 403 F.3d 324 (5th Cir. 2005) 22

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) 48

*Rankin v. McPherson*, 483 U.S. 378 (1987) 44, 57

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) 38, 47, 52

*Ryan v. Grapevine-Colleyville Indep. Sch. Dist.,* No. 4:21-cv-1075-P, 2023 U.S. Dist. LEXIS 41478 (N.D. Tex. Mar. 13, 2023) 52, 53

*Scott v. Flowers*, 910 F.2d 201 (5th Cir. 1990) 18, 23, 24

*Shah v. Univ. of Tex. Sw. Med. Sch.*, 129 F. Supp. 3d 480 (N.D. Tex. 2015) 27, 28

*Shamloo v. Miss. State Bd. of Trs.*, 620 F.2d 516 (5th Cir. 1980) 36, 37, 55

*Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960 (5th Cir. 1972) 39

*Shepard v. Irving*, 77 F. App'x 615 (4th Cir. 2003) 26

*Smith v. Tarrant County College Dist.*, 670 F. Supp. 2d 534 (N.D. Tex. 2010) 37, 43

*Snyder v. Phelps*, 562 U.S. 443 (2011) 43, 54, 56

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) 25

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) 50

*Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013) 59

*Texas v. Johnson*, 491 U.S. 397 (1989) 43, 54

*Tinker v. Des Moines Ind. Sch. Dist.*, 393 U.S. 503 (1969) 37, 39, 41, 43

*U.S. Navy Seals 1-26 v. Biden*, 72 F.4th 666 (5th Cir. 2023) 20

*United States v. Abbott*, 85 F.4th 328 (5th Cir. 2023) 34

*United States v. Garcia-Ruiz*, 546 F.3d 716 (5th Cir. 2008) 25

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) 20, 21

*Van Overdam v. Texas A&M Univ.*, 43 F.4th 522 (5th Cir. 2022) 28

*Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) 23

*Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321 (5th Cir. 1997) 20

*Williams ex rel. J.E. v. Reeves*, 954 F.3d 729 (5th Cir. 2020) 32

*Williams v. Kentucky*, 24 F.3d 1526 (6th Cir. 1994) 27

*Yeargin Constr. Co. v. Parsons & Whittemore Ala. Mach. & Servs. Corp.*, 609 F.2d 829 (5th Cir. 1980) 20

*Zeng v. Tex. Tech Univ. Health Sci. Ctr. at El Paso*, No. EP-19-CV-99-KC, 2020 U.S. Dist. LEXIS 40734 (W.D. Tex. Mar. 4, 2020) 29

### *Statutes*

28 U.S.C. § 1331 ____ xiii

28 USCS § 1292 ____ xiv

42 U.S.C. § 1983 ____ xiii, 35

### *Other Authorities*

Ilya Shapiro, Lawless: The Miseducation of America's Elites (Broadside Books, 2025) ____ 40

### *Rules*

Fed. R. App. P. 8 ____ xiv

## JURISDICTIONAL STATEMENT REQUIRED BY FED. R. APP. P. 28(A)(4)(A-D)

Plaintiff-Appellant Ellen Mae Fisher was, up to the time of her graduation in spring 2026, a law student at Texas Tech School of Law, a Texas state university. Jurisdiction is based on federal questions related to Fisher's claim for First Amendment retaliation under 42 U.S.C. § 1983 as well as the First and Fourteenth Amendment to the United States Constitution, which are laws of the United States. Fisher invokes subject matter jurisdiction under 28 U.S.C. § 1331. ROA.64, ¶ 38.

Fisher moved for a temporary restraining order and preliminary injunction on April 12, 2026 in the United States District Court for the Northern District of Texas. ROA.92. The court below denied this motion, finding lack of jurisdiction over the injunctive relief requested under *Ex parte Young*, 209 U.S. 123 (1908) and finding that the infringement of Fisher's right to speak freely on matters of public concern did not cause irreparable harm, making injunctive relief inappropriate. ROA.894, 1175.

The court below nevertheless did find jurisdiction over the Defendants-Appellees members of the Board of Regents of the Texas Tech University System, Jack Nowlin, and Jarod Gonzales in their official capacities as state actors. ROA. 900 and n.31.

Fisher is entitled to appeal to this Court the lower court's denial of a preliminary injunction under 28 USCS § 1292(a)(1).

Fisher timely filed her Notice of Appeal on June 5, 2026. ROA.1160. To perfect her appeal, under Fed. R. App. P. 8(a)(1)(C), Fisher was required to move for a preliminary injunction pending appeal in the court below, which she did on May 29, 2026. ROA.1074. The court below denied motion as well. ROA.1175.

## ISSUES PRESENTED FOR REVIEW

Plaintiff-Appellant Ellen Mae Fisher spoke in the Texas Tech School of Law (Texas Tech or TTU) concerning the public assassination of the public intellectual, conservative organizer, father, and zealous advocate of free speech, Charlie Kirk, on September 10, 2025. Ms. Fisher unapologetically opposed Mr. Kirk's viewpoints, greeted his murder positively, and said so openly, which Defendants-Appellees understandably found repugnant. Contrary to everything Kirk stood for, Defendants-Appellees resolved to punish Fisher for this speech.

Although Fisher was hardly alone in expressing such sentiments among the faculty or students, Texas Tech singled out Fisher for an "investigation" and then reprimanded her the day after she filed this law suit. Defendants-Appellees rushed to report Fisher to the Texas Board of Law Examiners, advocating against her admission to practice law in an application process to the Texas bar that is still ongoing.

Fisher moved for a preliminary injunction which the court below denied, finding no jurisdiction because Texas Tech's reprimand was supposedly a state officials' final administrative act, and thus could not be reached by prospective injunctive relief under *Ex parte Young,* 209 U.S. 123 (1908). This was despite the ongoing prospective impact on Fisher's career. The court also held Fisher

suffered no irreparable harm. The issues presented are:

1. Is there federal jurisdiction under *Ex Parte Young* over a request for prospective injunctive relief expunging and annulling a reprimand from a student's disciplinary record, where the student filed suit and moved for an injunction prior to the issue of the reprimand?
2. Does a prohibitory injunction to restore the parties' last uncontested status pending trial become unavailable when a defendant imposes harm on the plaintiff after she has moved for a preliminary injunction but before the District Court can rule on the motion?
3. Is it prospective in nature to expunge records of illegal discipline for protected speech on matters of public concern?
4. Is it prospective in nature to order retraction of a report of illegal discipline to the Texas Board of Law Examiners, whose evaluation of a new juris doctoral candidate for admission to the Texas bar is ongoing?
5. Does a disciplinary reprimand for protected speech and its report to third parties irreparably harm a student?
6. Should this Court issue a preliminary injunction expunging and annulling the Plaintiff-Appellant's disciplinary record due to First Amendment retaliation pending trial?

## I. Plaintiff-Appellant's Statement of the Case[1]

In 2023, Fisher enrolled in Texas Tech's School of Law (TTU). ROA.126, ¶ 31. In 2025, as a 3L student, Fisher was nearing graduation. ROA.124, ¶ 20. She also attended TTU as an undergrad, enrolling in 2018 and graduating in 2023. ROA.124-125, ¶¶ 22, 24. She demonstrated exemplary conduct and leadership, for which TTU (among other institutions) recognized her with scholarships and awards. ROA.125-126, ¶¶ 25-36. After the spring 2026 semester in which her supposed "conduct" (the State's euphemism for speech when they dislike its content) supposedly disrupted TTU's legal clinics, TTU awarded Fisher straight A's in those very courses. ROA.1108. Fisher is also black, although she was raised by white parents in California. ROA.125, ¶ 23.

The Court may take judicial notice that at approximately 1:30 p.m., central time, on September 10, 2025, an assassin's bullet cut down the public intellectual, conservative political organizer, and father, Charlie Kirk, while he advocated for free and open debate on campus.

---

[1] Fisher attested under the penalties of perjury to a narrative of events set forth in her Affidavit (Record on Appeal (ROA).122-133) in support of her Motion for Preliminary Injunction (ROA.92-120) and incorporated into her operative Complaint in the court below. See ROA.121-414, 888-893, 1098-1136.

Contrary to all that Kirk stood for, Defendants-Appellees took his tragic assassination as an opportunity to intensify the suppression of free speech at TTU, in particular Fisher's.

When news of Kirk's murder broke, Fisher was in the law class of Fred Gray Endowed Chair for Civil Rights and Constitutional Law, Professor Kenneth Williams. ROA.126, ¶ 36. Another student, Henry Tescci, who is not black, announced Charlie Kirk had been shot just before class ended, and Tescci also announced that Kirk was a conservative activists or white supremacist (accounts differ). ROA.126, ¶ 39, ROA.262-263 (2:31:08, 2:32:42).[2] Students immediately shared videos of the assassination. ROA.126, ¶ 40. Professor Williams did not consider this disruptive, out of the ordinary, or unprofessional. ROA.265-266 (2:36:00-29).

From Williams' class, Fisher descended a flight of stairs to the clinical program offices, where she stopped in Professor Joe Stephens' office, a clinical professor who handles criminal defense. ROA.127,

---

[2] Exhibit D to the Fisher Affidavit (ROA.146-264) is an unedited, uncorrected transcript of the Honor Council, apparently produced by the transcription software Rev.com. This is a complete audio recording of the hearing convened to discipline and punish Fisher for her protected expression. In this brief, citations to this transcript provide timestamps in parenthesis.

¶¶ 42-43; ROA.178-186 (14:04-26:03). They discussed Charlie Kirk's assassination for approximately 30 seconds. ROA.181 (17:51). Professor Stephens has testified that he assures students they can talk about anything in his office, clearly designating his office as an open forum for such discussions; he said about his interaction with Fisher, "So nothing unusual about it at all, and I encourage that. I want people to feel comfortable coming to us, in talking to us." ROA.158 (21:20). Professor Stephens did not consider Fisher's interactions disruptive. This conversation lasted approximately 30 seconds. ROA.156 (17:51).

Fisher continued down the hall to her clinical professor's office, Patrick Metze. ROA.127, ¶ 48. Like Stephens, Professor Metze had made clear that he designated his office as an open forum, a "safe space in which they [students] could say anything that they needed to say" as full-grown adults "rather than a third-grade schoolyard." ROA.288, ¶¶ 3-4. Other students were already discussing Kirk, including fellow TTU 3L, Ashanty Bishop, a white student. ROA.278, ¶¶ 4-5, ROA.289, ¶ 13-15. Professor Metze did not consider anything said in his office unprofessional. ROA.288, ¶ 6. "The conversation was normal and productive." ROA.278, ¶ 5.

At some point the Director of the Family Law Clinic, Terri Morgeson inserted herself into Metze and his students' conversation by appearing at his office door to announce, "By the way, he's [Charlie Kirk] dead" (ROA.164 (32:25)) or "Trump just said that he died," or words to that effect. ROA.128, ¶ 52, ROA.278, ¶ 7, ROA.289, ¶ 9. Morgeson's own eavesdropping on Professor Metze and his students apparently made her experience some form of emotional dyspepsia. For example, she later insisted that this alleged distress caused her to "shut [Metze's] door" to shield allegedly tender ears at TTU from hearing things they did not like or disagreed with. ROA.164-165, 168, 172-173, 175, 178-179 (32:25; 34:58; 40:55; 47:15; 48:56, 52:28; 58:28; 59:52). In reality, this melodramatic gesture never happened. No witness confirms it; several affirmatively deny it. ROA.128, ¶¶ 54-55, ROA.290,¶ 22.

Closing Metze's door was not the only thing Morgeson made up in an apparent effort to set herself up as some sort of TTU hall monitor and punish Fisher. Morgeson reported to the eventual investigator, William Keffer, that Fisher pronounced about Kirk, "That mother fucker got shot"; but then Morgeson retracted this later. Compare ROA.164, 170-171 (30:48-31:49, 33:15-34, 43:21-44, 45:07-33). Not even

her own students confirmed this (Allison Monacelli or Madison Wright); nor did anyone else. ROA. 128, ¶ 57 (Fisher), ROA.159 (Stephens (23:31-35), ROA.185-190 (Wright, 1:10:03-18:03), ROA.196 (Monacelli, 1:27:59-28:32), ROA.232 (Bishop, 2:26:33-46), ROA.240 (Williams, 2:36:00-06), ROA.275, ¶ 21 (Pombrio), ROA.289, ¶ 16 (Metze). Allison Monacelli testified that it was Morgeson herself who spread this "mother fucker" story, but Monacelli never heard it from Fisher. ROA 196 (1:27:59). In other words, Morgeson started this malicious rumor at the time.

Another whopper was Morgeson's report that Professor Stephens had dressed down Fisher for improper speech about Kirk. ROA.163 (29:27-30:16). Of course, this never happened either. ROA.158 (22:12). Stephens had no memory "of being like, … 'That [Fisher's speech] was wrong.'" *Id.*

The most notable thing that distinguished Fisher's speech that day was that, unique among all TTU students discussing Charlie Kirk in Morgeson's proximity, Fisher is black. For example, Morgeson's (white) students were speaking so loudly about Kirk that Professor Stephens could hear them across the hall in his office. ROA.160-161

(24:59-25:06). They were not disciplined or punished for this "conduct."

After discussing this national tragedy in Metze's office as well as their criminal defense work, Fisher left to go to the student Clinic Office. ROA.128-129, ¶¶ 58-59. This is a conference room at the end of the hall where students can call clients, finish course work, discuss cases, and even gossip. *Id*. Until recently, students have always felt free to discuss sensitive topics in the Clinic Office, as students attested—even those who disagree with Fisher's viewpoints. See e.g. ROA.219 (Gomez, 2:11:55- 12:18).

In the Clinic Office, students continued their conversation about Kirk. One opined that Charlie Kirk was going "to hell." ROA.208, 210 (Bomar, 1:52:01; 1:55:22), ROA.129, ¶ 63. Yet it was only Fisher, the black student, who was investigated for having uttered such improper thoughts and feelings but no one else. *Id*. TTU's eventual "investigator" asked students about the "going to hell" statement but disregarded their evidence when it became clear someone else (not black) said it. Compare ROA.293, ¶ 14 (Perez), ROA.144 (Keffer Report).

Meanwhile, Morgeson was not only making things up about

Fisher but also rushing to the administration to report her for alleged "unprofessionalism." ROA.607, ¶ 4-5. Apparently, at TTU, this is "professional conduct" but frank discussion in a professor's office is somehow "unprofessional."

Two weeks later (September 23, 2025), Defendant-Appellee Dean Jack Nowlin appointed Professor William Keffer to "investigate" whether Fisher had "acted unprofessionally." ROA.597-598. Keffer took five months to investigate Fisher's improper speech, interviewing no fewer than nine faculty members, one Associate Dean, the Law School Dean, and 12 students. *Id*.

Yet Keffer's eventual report only had room for information that cast Fisher in the worst possible light, much of it Morgeson's make-believe. ROA.600-604. Keffer excluded all exculpatory evidence. By way of example, numerous witnesses affirmed that Fisher had not said, "the mother fucker got shot." Compare ROA. 143-145 (interviews summarized by Keffer) and ROA.118, 143 (Stephens, 23:31-35 (disconfirming "mother fucker" comment omitted from Keffer Report), ROA.196, (Monacelli, 1:27:34-28:32 (omitted entirely from Keffer Report for lack of inculpatory evidence)), ROA.278-279, ¶¶ 9-11 (Bishop

(likewise omitted entirely), ROA.292-293, ¶¶ 11-15 (Perez, reported by Keffer as saying only "Fisher talked about Kirk like she knew who he was").

The almost comical bias of the Keffer report is captured by law student Callaghan Ard (interviewed November 11, 2025). ROA.142. After reviewing the Keffer Report, Ard attested:

> In that report, my statement is summarized in a single sentence noting that "Fisher offered to show me her video on her phone." [ROA.145.] I am unsure why the remainder of my statements from that interview were omitted.
>
> During the interview, I was asked whether I heard Ellie [Fisher] make a statement such as "The mother fucker got shot" or "They shot the mother fucker," and I responded that I did not.
>
> This response was not included in the report.
>
> I was also asked whether I believed Ellie was capable of making such a statement, and I explained that it would depend on the setting, but that she would never say something like that in class. That was also omitted from the report.
>
> I don't know why the statements were excluded from the report, though it appears that leaving them out served to unfairly portray Ellie in a negative light.

ROA.285-286, ¶¶ 11-15.

Keffer made time to include wildly irrelevant statements, in particular from an interview with Professor Metze, to the effect that

"mother fucker" is a phrase "common … in the black community"—as if white people are somehow too proper to say this, or as if Fisher had not been raised by white parents. ROA.144. Keffer also found it significant that witnesses reported that Fisher spoke to her mother. *Id*. Thus, the TTU not only has volunteer eavesdroppers like Morgeson; it now purports to monitor students' conversations with their mommies.

After excluding all exculpatory evidence, Keffer referred Fisher to an Honor Council (on January 23, 2026). ROA.137. The Chair of the Honor Council was Defendant-Appellee Professor Larry Spain. *Id*. Little more than a week later (February 4, 2026), Spain directed Fisher to appear at a hearing set for February 20, 2026. ROA.139. Defendants-Appellees Hardberger, Outenreath, and Owens were also members of the Honor Council convened to condemn Fisher's improper thoughts and expressions. *Id*.

The Honor Council is governed by an Honor Code, under which Defendants-Appellees may impose sanctions only under the demanding standard of "clear and convincing evidence." ROA.298. Yet the Honor Council disregarded this policy. Not only did the Honor Council accept a blatantly biased report; its eventual decision followed Morgeson's

testimony despite her constant dissimulation, exposed in the hearing; or, by way of example, the Honor Council "found" that Fisher somehow "interfered with" Madison Wright's work in the clinic despite Wright testifying that she "wasn't upset about" what Fisher said. Compare ROA.269, 211 (1:12:37-43).

Approximately two weeks after the hearing, the Honor Council, over one (unnamed) member's vigorous dissent, found Fisher responsible for violating § H (Violation of Professional Duties) of the Honor Code (issued March 11, 2026). ROA.195-197.

Section H reads:

> A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities….

ROA.296. Yet the only portion this rule that the Honor Council invoked was "failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs…" ROA.260. The record is devoid of evidence of performance-related deficiencies in representing clients or completing clinic work, much less the breach of any fiduciary obligations. See e.g. ROA.186-190 (Wright,

1:10:34 ("nothing out of the ordinary"); 1:12:37-43 ("wasn't upset about it … wasn't personally offended"); 1:16:36 (not Fisher's "conduct" but "just the whole situation" made her want to go home)), ROA.196 (Monacelli, 1:28:20-32 ("didn't hear" what Fisher said); (1:28:51, "felt very uncomfortable in clinic … just because we are all finding out this news as it comes" without mentioning Fisher, specifically), ROA.210 (Bomar, 1:54:20-58 ("wouldn't say [Fisher acted] unprofessionally" and was not "in any way unable to perform … clinic duties"), ROA.220-221 (Gomez, 2:15-18-46 "more generally … the entire room" made him feel uncomfortable, not specific to Ms. Fisher).

Given that the actual students had not been upset specifically by Fisher, the only witness the Honor Council could fall back on was the ever-prevaricating Terri Morgeson, whom TTU elevated to the status of some sort of unofficial informant on students and colleagues alike. See e.g. ROA.269. Given the Honor Council's vague decision, it has always been unclear exactly which one of Fisher's utterances they identify as "unprofessional." The Honor Council merely stated:

> Upon entering the [unspecified] offices on September 10, 2025, a majority of the Council found by clear and convincing evidence that … Ellie Fisher was loud, happy, and celebratory and made certain statements to the effect

> that she was in a good mood because Charlie Kirk had been shot.

*Id.* In other words, Ellie Fisher was found guilty for voicing improper subjective feelings. But it was Fisher's viewpoints that really bothered the Honor Council:

> Ellie Fisher was aware that students in the clinical program had different political viewpoints and that statements and actions taken following the death of Charlie Kirk within a professional setting could create conflict among co-workers that would interfere with performance of work.

ROA.269. Fisher had also uttered "[alleged] statements endorsing or celebrating death or violence … contrary to respect for the rule of law and [which allegedly] violate ordinary standards of professional conduct." *Id.* Thus, there can be no dispute that Defendants retaliated against Fisher for viewpoints, not supposed "conduct," unless TTU redefines speech as "conduct."

Yet, however obnoxious the mirth expressed over the assassination of Kirk, the Honor Council's indignation was entirely pretextual. Mockery of the dead is common in the clinics, as is profanity, including from the mouth of Morgeson. ROA.890-892, ¶ 5-19 (student Perez attesting to clinic faculty's "F bombs," Morgeson's

cursing, and Professor Dwight McDonald mockery of deceased clients). Furthermore, TTU did not punish other students for opining that Kirk was "racist" or that he would "go to hell." Keffer only investigated these topics with regard to Fisher, but omitted the answers when he did not want to hear. See e.g. ROA.293, ¶ 14. Only one "uppity" black woman was ever punished for talking about the same thing everyone else was talking about.

Morgeson said the quiet part out loud, making clear it was Fisher's viewpoint that TTU had to suppress: "I hope nobody who is Republican and right-leaning… had heard that." ROA.165 (35:39). Or as Morgeson lectured Fisher:

> Fisher: So you keep using the term inappropriate. Would you describe … the difference between inappropriate versus unprofessional …
>
> Morgeson: I consider them one and the same.…
>
> It was the tone and the manner in which the discussion was being held. It wasn't, "Oh my gosh, have you heard that Charlie Kirk got shot?" It was exuberance in the fact that he got shot, that he deserved it because he was a horrible human being and y'all thought that he was dead because of the way that his head had moved and the blood shooting out of his neck.

ROA.172-173 (48:16-56).

In sum, if only this black student, Fisher, had expressed correct feelings and opinions, Morgeson would have found this "professional" and unoffensive. By contrast, Morgeson's (white) Family Clinic students could be heard chattering about the murder of Charlie Kirk from Professor Stephens' office, but to Morgeson and the Honor Council, the correct viewpoints and conversations expressed by these young women were somehow just "private conversations." ROA.127, ¶ 46, ROA.180 (1:01:41-55). No other students were ever disciplined or even investigated, only the black student, Fisher. *Id*. The students exempt from punishment included the white students in Professor Metze's office, who could be heard laughing and partaking in the same conversation with Fisher. ROA.164, 178, 196 (30:48; 59:11; 1:27:03-34).

The Honor Council recommended (on May 11, 2026) that Dean Nowlin issue a written reprimand, to be committed to Fisher's permanent student record. ROA.271. Fisher timely appealed through TTU's internal process (received by Defendants-Appellees on March 27, 2026). ROA.658. The appeal languished until the day TTU was notified that Fisher had filed suit, when Defendant-Appellee Jared Gonzales rushed to deny Fisher's appeal in a two-paragraph,

perfunctory decision. ROA.660.

Fisher filed in the Northern District of Texas just one month after the Honor Council issued its opinion.[3] ROA.266-272. Four hours after TTU learned that Fisher filed suit,[4] Defendant-Appellee Jack Nowlin hasten to issue the "reprimand."[5] ROA.671. Simultaneously, Dean Nowlin fired off another letter to the and report it to the Texas Board of Law Examiners (Law Examiners) to maximize the damage inflicted on Fisher's career. ROA.666-668. Invoking some unknown and never identified Dean's Star Chamber, outside the rules or procedures of TTU, Dean Nowlin claimed to have found additional evidence and facts which Fisher was never allowed to confront or refute. ROA.666. Nowlin's report accused Fisher of new, never before-disclosed accusations, ironically including "dishonesty" and invoked nonexistent "admissions," as well as Fisher's "refus[al] to take responsibility or show any remorse

[3] Suit was filed April 12, 2026. ROA.58. Fisher's counsel had notified Texas Tech that Fisher would file the previous week (April 8, 2026) if Defendants-Appellees did not cease the violation of her First Amendment rights and attached a draft complaint. ROA.1104-05.

[4] Fisher's counsel notified Texas Tech of her lawsuit on the day after filing at 12:32 PM (Central Time). ROA.158. Texas Tech immediately retaliated by issuing its "reprimand" approximately four hours later. ROA.671. The court below credited this as creating a "final state official's action" beyond challenge as "quintessentially retrospective." ROA.901.

[5] The timestamp (16:25:10 CDT) on April 13, 2026 appears on the form reported to the Law Examiners. ROA.671.

for her unprofessional actions." *Id.* and ROA.663. To be clear, by "actions" Nowlin means "speech." ROA.667. Likewise, Fisher's refusal to apologize for impermissible views is not an "action," it is compelled speech.

There is no dispute that the Law Examiners' process is still ongoing at the time of this appeal. Furthermore, Fisher has not only applied to be admitted to the bar of Texas, she also intends to seek admission to, at minimum, the District of Columbia and California. ROA.1111-1113.

Finally, it is difficult to imagine how Fisher could have taken legal action more swiftly to obtain injunctive relief. Just two months separated the Honor Council's recommendation of a "reprimand" and the lower court denial of jurisdiction over a preliminary injunction under *Young*. ROA.894-905. No sooner did Fisher bring suit, than they created new facts on the ground and declared their "reprimand" an accomplished deed. This allowed Defendants-Appellees to manufacture their own "status quo." By holding that this locked the door to *Young*, and by distinguishing reprimands from other varieties of student discipline, the court below has created the reprimand as a disciplinary

sanction for which a student has no effective remedy. Not only does this create new law, at odds with this and other circuits; it also deprives Fisher (and any plaintiff) of injunctive relief wherever a school can print reprimands faster than a court can issue orders.

Only six years ago, nationwide, state colleges and universities punished their faculty's and students' failure to genuflect to Black Lives Matter and squelched campus expression of improper feelings and opinions about the very public death of George Floyd, including at Texas state institutions.[6] After a so-called "vibe shift" and the tragic assassination of Charlie Kirk, TTU seeks a new tool to suppress campus speech. But "vibes" that shift one way will shift again. And make no mistake. The tools to repress the First Amendment for which the State seeks endorsement here will be used against students and professors indiscriminately, whichever way the wind blows.

## II. Summary of the Argument

Fisher seeks prospective relief to expunge, annul, and retract a retaliatory "reprimand" imposed for her speech about Charlie Kirk's assassination. The district court erred in denying this preliminary

---

[6] See *Jackson v. Wright*, 82 F.4th 362 (5th Cir. 2023); *Jackson v. Wright*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684 (E.D. Tex. Jan. 18, 2022).

injunctive relief.

Within 24 hours of Fisher filing suit and her motion for temporary restraining order and preliminary injunction, Defendants-Appellees not only issued a "reprimand" but also reported it to the Texas Board of Law Examiners, with the express intention of interfering with Fisher's livelihood. The ostensible reason for this discipline was "unprofessionalism," but this is pretextual. Fisher behaved no differently than any number of students who discussed Charlie Kirk's assassination. But TTU singled out only Fisher for discipline and punishment.

Because Defendants-Appellees issued and reported their reprimand before the court below could rule on Fisher's preliminary injunction, the court held that the "reprimand" had become a state official's final action. This, the court held, rendered any injunctive relief retrospective and divested the court of jurisdiction under *Ex parte Young,* 209 U.S. 123 (1908). The court also held infringement of First Amendment rights does not create irreparable harm, and Fisher is only entitled to monetary damages.

Yet *Young* permits injunctive relief when the effect of school

discipline is ongoing, and this Court has already held that past reprimands may be expunged for First Amendment violations. *Scott v. Flowers*, 910 F.2d 201 (5th Cir. 1990). The district court's contrary view would therefore overturn *Flowers* and create new law allowing state schools to defeat jurisdiction by rushing to issue disciplinary decisions before a court can act.

Finally, Fisher shows irreparable harm, because any infringement of the First Amendment causes irreparable harm; and she also shows a likelihood of success on her First Amendment retaliation claim. In particular, TTU's policies and her professors designated the spaces in which she spoke as open and available for free discussion, which TTU now suppresses because they abhor Fisher's viewpoints. But viewpoint discrimination is not permitted in any forum, and labeling disfavored speech "unprofessional" does not convert protected speech into punishable "conduct."

Finally, the balance of equities and the public interest favor an injunction: TTU has no legitimate interest in maintaining unconstitutional discipline, while Fisher faces continuing harm unless the reprimand and related reports are expunged and retracted.

## III. Argument

### A. Legal Standard on Appeal

#### *1) Standard for Granting a Preliminary Injunction*

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In the court below, Fisher sought a "prohibitory injunction [which] freezes the status quo, and is intended to preserve the relative positions of the parties until a trial on the merits can be held." *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) (internal quotations omitted).

In the Fifth Circuit, the "status quo is the last uncontested status of parties." *Yeargin Constr. Co. v. Parsons & Whittemore Ala. Mach. & Servs. Corp.*, 609 F.2d 829, 831 (5th Cir. 1980) (internal quotation omitted).

Here, the "last uncontested status" dates to the time prior to Defendants' investigation and eventual show trial to punish Fisher for her speech. ROA.638-649. Although it is not uncommon for a defendant to take action subsequent to a motion for preliminary injunction that moots the injunctive relief, these kind of cases

invariably involve the defendants' retraction of threatened or actual harmful policies or actions.[7] Here, no sooner did Fisher filed suit and move for a preliminary injunction than Defendants-Appellees further retaliated against her and now seek to block her career as a Texas attorney. ROA.666-668. Fisher has been unable to identify a case in which a defendant accelerates or exacerbates the harmful retaliation inflicted on the plaintiff and then claims this new "status quo" renders the harmful conduct "complete," and thus places prospective relief forever beyond reach.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).

"To obtain a preliminary injunction plaintiffs must show[:]

---

[7] "If a dispute ceases mid-litigation, so does our jurisdiction." Moved downtown line *U.S. Navy Seals 1-26 v. Biden*, 72 F.4th 666, 672 (5th Cir. 2023) (holding a preliminary injunction moot when challenged policy was repealed).

> (1) a substantial likelihood of success on the merits,
>
> (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted,
>
> (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and
>
> (4) that the injunction will not disserve the public interest."

*Planned Parenthood v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005).

Although a preliminary injunction is an extraordinary remedy, "[t]o show a likelihood of success, the plaintiff must present a *prima facie* case but need not prove that [she] is entitled to summary judgment." *Daniels Health Scis., LLC v. Vascular Health Scis.*, LLC, 710 F.3d 579, 582 (5th Cir. 2013); see also *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (reversing denial of preliminary injunction and instructing lower courts on the difference between carrying the burden of proof for "actual success" at summary judgment and "substantial likelihood of success on the merits") (citing *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 596 n.34 (5th Cir. 2003)).

*2) Standard For Appellate Review of Denied Preliminary Injunction*

"The ultimate decision for or against issuing a preliminary injunction is reviewed under an abuse of discretion standard." *Direct*

*Biologics, L.L.C. v. McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023) (citations omitted). Although factual determinations will be overturned only if clearly erroneous, here the district court did not pass on the factual record. Rather, the court's decision is based solely on conclusions of law concerning jurisdiction under *Ex parte Young*. ROA.894-905, 1175-1182. The lower court's "[c]onclusions of law are reviewed de novo." *Id*. "As to each element of the district court's preliminary-injunction analysis, … the district court's findings of fact are subject to a clearly-erroneous standard of review, while conclusions of law are subject to broad review and will be reversed if incorrect." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (internal quotation omitted)

### B. This Court Already Established Annulment/Expungement of a Reprimand as Prospective Relief for First Amendment Retaliation

In *Scott v. Flowers*, 910 F.2d 201 (5th Cir. 1990), this Court addressed whether expungement of a reprimand is prospective relief in a First Amendment cases. Indeed, this Court enjoined a reprimand long after it issued. In *Flowers*, the Texas Commission on Judicial Conduct reprimanded a Justice of the Peace after he wrote a public

letter critical of a county judicial system. The plaintiff sued, demanding expungement and claiming the commission had illegally disciplined protected speech. *Id.* at 205.

The reprimand in *Flowers* had long been committed to the plaintiff's record by the time the sought injunctive relief. This did not change the Court's analysis. Although *Flowers* does not say exactly when the plaintiff filed, the commission formally reprimanded him on March 19, 1984. *Id.* at 204. The plaintiff presumably sued directly thereafter. *Id.* Obviously his claim remained alive, even after the district court entered summary judgment; and then this Court did not reverse until six later, finding, "the Commission could not constitutionally reprimand" the Justice of the Peace. *Id.* at 213. This Court directed the offending parts of the Justice of the Peace's disciplinary record to be expunged. *Id.* At no point, was the reprimand considered a "final state official's action" beyond the reach of the federal jurisdiction under *Young*. Cf. ROA.901.

Clearly, the federal court could exert jurisdiction over expungement of the reprimand. No authority since 1990 suggests otherwise. The judge below brushed *Flowers* outside, holding he was

"not bound by implicit jurisdictional assumptions made in earlier cases." ROA.1178 (quoting *BNSF Ry. Co. v. Fed. R.R. Admin.*, 105 F.4th 691, 697 n.4 (5th Cir. 2024)). However, the court below leaned on authority that dismissed convoluted, improbable "drive-by jurisdiction" arguments. The parties in those cases were grasping for jurisdiction.[8] This Court reviewed and rejected these jurisdictional arguments because jurisdiction had never been found and did not lie. *Id.* In *Flowers*, nothing suggests that jurisdiction did lie and was never controversial.

*Flowers* is also consistent with decisions of other circuit courts. See *Jensen v. Brown*, 131 F.4th 677, 696-697 (9th Cir. 2025) (addressing First Amendment claim of community college math professor and holding "full expungement" of records, including "letters of reprimand," "constitutes prospective relief and so is not barred by sovereign

[8] The court below invoked footnote 4 in *BNSF*, which cites *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91-92 (1998) (considering whether a precedent could establish alternative jurisdictional grounds other than the grounds actually invoked by that precedent); *United States v. Garcia-Ruiz*, 546 F.3d 716, 718 n.1 (5th Cir. 2008) (considering whether jurisdiction despite mootness on "the merits of an earlier suppression hearing can be examined despite the defendant's having stipulated to all the elements" and based on cases that did not discuss mootness); *Kershaw v. Shalala*, 9 F.3d 11, 13 (5th Cir. 1993) (considering whether jurisdiction over an interlocutory appeal was justified despite no known applicable exception to the general rule that interlocutory appeals are not permitted).

immunity") (citing *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (analogous student case holding student's injunctive relief clearing school record of past violations was prospective).

*Jensen* also reversed a district court ruling, much like that which Fisher appeals here, that erroneously found expungement of past disciplinary actions was ***retrospective*** rather than ***prospective***. *Jensen*, 131 F.4th at 683. "Although the negative performance evaluations and letters of reprimand arose from the Administrators' alleged past constitutional violations, *Ex parte Young* does not demand that the relief sought be unrelated to past violations. Rather, a plaintiff may pursue relief that 'would relate to [a] past violation,' so long as it 'would not amount to relief solely for the past violation.'" *Id.* at 697 (quoting *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 841 (9th Cir. 1997)).

Likewise the Ninth Circuit, in *Burch v. Barker*, 861 F.2d 1149 (9th Cir. 1988), reversed a district court's judgment in favor of a high school in a prior restraint case, where plaintiffs had received reprimands for distributing a student-run newspaper on school grounds in violation of school policy and sought injunctive relief to expunge reprimands from

their student records.

The Ninth Circuit is not an outlier. See also *Shepard v. Irving*, 77 F. App'x 615, 496-497 (4th Cir. 2003) (holding *Ex parte Young* exception applied to expungement of already entered "F" grade and plagiarism conviction, which "would constitute a continuing injury to the plaintiff," and "would be prospective in nature"); *Williams v. Kentucky*, 24 F.3d 1526 (6th Cir. 1994) (expungement of all references relating to demotion was prospective); *Malkan v. Mutua*, No. 12-CV-236-A, 2012 U.S. Dist. LEXIS 143311, *20 (W.D.N.Y. Oct. 3, 2012) (reinstatement and expungement of personnel file "of any wrongful disciplinary actions" permitted under *Ex parte Young*) (citing *Elliott v. Hinds*, 786 F.2d 298 (7th Cir.1986) (finding a former state employee's request that personnel file be cleared of derogatory material is purely prospective). Cf. *Matos v. Clinton Sch. Dist.*, 367 F.3d 68 (1st Cir. 2004) (denying PI to purge student disciplinary records but indicating student could not show future harm, unlike Fisher here).

Thus, expunging student disciplinary records as prospective relief is not controversial. Furthermore, not only did the court below fail to invoke authority to support its decision on this point, the state of Texas

did not even brief this issue. See ROA.549-578. The District Court did invoke *Shah v. Univ. of Tex. Sw. Med. Sch.*, 129 F. Supp. 3d 480 (N.D. Tex. 2015) (due process case). But *Shah* actually held that expungement of disciplinary records ***is proper*** injunctive relief. *Id.* at 491-92. The student in *Shah* adequately pleaded prospective injury because he was about to apply for admission to other universities, just as Fisher here is in the process of applying for admission to the bar. *Id.* at 492. Once again, *Shah* did not find the jurisdictional question controversial: "Courts 'have generally permitted future events which are sufficiently likely to occur to serve as a basis for standing when the plaintiffs, as here, are seeking injunctive relief." *Id.* (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010)).[9]

Until Fisher's case, the lower courts of the Fifth Circuit treated expungement as a prospective remedy. See e.g., *Heilrayne v. Univ. of Tex.*, No. 1:25-cv-640-DAE, 2026 U.S. Dist. LEXIS 47701, at *5-*6 (W.D. Tex. Jan. 27, 2026) ("Court … finds that although Plaintiffs … have

[9] The court below appears to have misread *Shah*, which dismissed the plaintiff's claim albeit only after confirming its own jurisdiction over the injunctive relief sought. See ROA.903 ("Judge Fitzwater granted preliminary injunctive relief"); compare *Shah v. Univ. of Tex. Sw. Med. Sch.*, 129 F. Supp. 3d 480, 507 (N.D. Tex. 2015) (granting motion to dismiss and directing final judgment against plaintiff). This error is not material, however.

graduated and [one] Plaintiff['s] … probation period has ended, their requests to amend their disciplinary records constitutes prospective relief appropriate under *Ex parte Young*") (citing *Van Overdam v. Texas A&M Univ.*, 43 F.4th 522 (5th Cir. 2022)); *Zeng v. Tex. Tech Univ. Health Sci. Ctr. at El Paso*, No. EP-19-CV-99-KC, 2020 U.S. Dist. LEXIS 40734, at *17 (W.D. Tex. Mar. 4, 2020) (holding, research associate's "injunctive claims—including expungement of his personnel file and a prohibition on allegedly defamatory or stigmatizing statements about the Plaintiff—are properly characterized as prospective) (citing *Shah* at 496-97); *Daniels v. Tex. DOT*, No. 4:15-CV-00702-CAN, 2016 U.S. Dist. LEXIS 166407 (E.D. Tex. Dec. 2, 2016) (under Americans with Disabilities Act, finding "request for expungement of disciplinary records is prospective in effect") (collecting cases).

In short, almost every court to address this issue has found the expungement of past disciplinary actions, including final disciplinary decisions, prospective relief.

### C. Expungement Specifically Protects against Unfair Prejudice in Bar Proceedings

*Morgan v. Bd. of Prof'l Responsibility of the Supreme Court of*

*Tenn.*, 63 F.4th 510, 515-18 (6th Cir. 2023) exemplifies how expungement of past disciplinary records is appropriate to protect a plaintiff's reputation with a state bar overseer. In *Morgan,* although an attorney's First Amendment claim failed (at the 12b stage, without prejudice) against the Tennessee equivalent of Texas Law Examiners; nevertheless, the court indicated that expungement remained a proper prospective remedy.

Relevant here, the Sixth Circuit reversed the lower court's finding that it had no jurisdiction under *Ex parte Young**Error! Bookmark not defined.***. *Id.* at 516. Even after the Tennessee Board of Professional Responsibility dismissed its claims, the plaintiff posited that he would be "harmed by the Board's continued maintenance of disciplinary records against him and other internal records." *Id.* The court held: "expungement of negative government records pertaining to an aggrieved individual may qualify as prospective relief to remedy a constitutional violation." *Id.*

Although *Morgan* is not strictly an education case, the Sixth Circuit relied upon student cases drawn from the educational context. *Id*. at 516-517. See *Doe v. Cummins*, 662 F. App'x 437, 441-442, 444

(6th Cir. 2016) (University of Cincinnati students, one sanctioned with nothing more than "disciplinary probation" and the requirement to write a "research paper"; another suspended for three years but who meanwhile transferred to another educational institution; could request injunctive relief "prohibiting the imposition of, or reporting of, any disciplinary action against the [University's] Code of Student Conduct"); *Doe v. Purdue* Univ., 928 F.3d 652, 666 (7th Cir. 2019) (finding injunction requiring expungement of guilty finding from student's disciplinary record was not precluded by the Eleventh Amendment).

### D. *Green Valley* Also Indicates an Injunction Is Warranted

The court below relied on *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 473 (5th Cir. 2020) for the principle that "injunctions that are packaged as prospective relief but require 'the voiding of a final state' official's action are 'quintessentially retrospective.'" ROA.901. However, it is error to consider Defendants-Appellees' student discipline a "final state official's action" under the *Green Valley* standard.

*Green Valley* concerned vendors' disputes with each other as well as with the Texas Public Utility Commission over certifying territories

for water and sewer service. *Id.* at 465. The case does not address the unique nature of public education or the suppression of free speech. Expungement of records was not at issue.

Concerning injunctive relief, *Green Valley* drew no bright line but found "the line between the permissible and the forbidden is fuzzy. 'In discerning on which side of that line a particular case falls, we look to the substance rather than to the form of the relief sought and will be guided by the policies underlying . . . *Young*.'" *Id.* at 471 (quoting *Papasan v. Allain*, 478 U.S. 265, 279 (1986)).

"As long as the claim seeks prospective relief for ongoing harm, the fact that a current violation can be traced to a past action does not bar relief." *Id.* at 471-472 (quoting *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 738 (5th Cir. 2020)). Here, the ongoing harm is Defendants-Appellees' continuing effort to ruin Fisher's admission to any bar she applies to, where that process is undisputedly ongoing, which the Law Examiners have themselves expressly stated to Fisher.

The lower court is correct that *Green Valley* delineates permissible prospective relief and impermissible retrospective relief. Yet this line favors Fisher. The *Green Valley* plaintiff sought to undo a utility

commission's past order. The commission had decertified portions of the plaintiff's service territory to swap in another service provider. This Court held that an injunction would be prospective if it prevented the commission from continuing implementation of its illegal order, but retrospective where the commission had already completed implementing that self-same order. *Id.* at 473.

Here, Defendants' report to the Law Examiners may be corrected as an ongoing harm because Defendants' unconstitutional reprimand remains part of the Law Examiners' continuing evaluation, which will not be decided for months. This constitutes an ongoing injury to Fisher's constitutional rights, not a completed action. Furthermore, as *Green Valley* emphasized, the injunction Fisher seeks does not "require[e] any money to be taken from the state's coffers." *Id.* at 473. Furthermore, TTU can be prospectively enjoined from reporting their illegal reprimand to any future bar overseer or employer.

Furthermore, TTU's "reprimand" is not analogous to the *Green Valley* commission's "order decertifying" territory for water and sewer service in *Green Valley*. *Id.* at 472. For one, TTU orders nothing. All a student reprimand ever does, its sole purpose, is establish a disciplinary

record with the express purpose of casting a shadow over the student's career going forward. To that end, TTU's hasty report of the "reprimand" to the Law Examiners merely makes Defendants-Appellees ongoing witnesses in the Law Examiners' fitness and character process. That process was not concluded at the time of filing either in the district court or at the time of this appeal. In other words, rather than a "final state official's action," all TTU has done is seek enforcement of its "reprimand" through the Law Examiners' ongoing process. Furthermore, the "reprimand" will continue to haunt Fisher as she applies for admission in other jurisdictions.

Ordering state actors to undo past, affirmative actions that cause ongoing harm, is consistent with *Ex parte Young*, particularly in the educational context. See e.g., *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667 (1973) (ordering reinstatement and restoration of course credits for professional journalism student who published allegedly indecent material in article entitled, "Mother F----- Acquitted").

Nor is Fisher's case comparable to *United States v. Abbott*, 85 F.4th 328, 336 (5th Cir. 2023), where the Governor's executive order could not be retrospectively enjoined. There, the Department of Public

Safety "alone," not Governor Abbott, "will enforce the order in the future." *Id.* Here, by contrast, the official-capacity Defendants-Appellees are directly involved as on-going witnesses attesting to Fisher's fitness and character in an ongoing process. In addition, they seek to ruin Fisher's reputation wherever she goes, not just with the Law examiners. This would be true even if the Law Examiners were to complete their review tomorrow.

### E. Injury to Fisher's First Amendment Rights Is *Per Se* Irreparable

Without authority, the court below held that infringement of Fisher's First Amendment rights "is not irreparable." ROA.1181. Rather, the judge reasoned that it suffices that monetary damages are available under 42 U.S.C. § 1983. *Id.* This is error.

It is well established that the "loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021) (finding reversible error and abuse of discretion in the denial of a PI for violation of First Amendment rights) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The Supreme Court has applied this standard to the threat of student reprimands. *Mahmoud v. Taylor*, 606 U.S. 522, 546, 569 (2025)

(holding school board's threat to reprimand students, among others, for dissent from message purveyed by LGBTQ+ storybooks created irreparable harm and impermissible burden on First Amendment rights); *Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279, 294-297 (5th Cir. 2012) (finding abuse of discretion where lower court disregarded irreparable harm of First Amendment infringement).

Although the above cases address primarily the First Amendment's free exercise clause, there is no distinction indicating lesser harm is caused by trampling a student's free speech rights. For example, in *Shamloo v. Miss. State Bd. of Trs.*, 620 F.2d 516 (5th Cir. 1980), this Court found abuse of discretion in the denial of a preliminary injunction to Iranian students protesting their home country's government in violation of a campus "wholesome" speech policy. *Id.* at 523. In particular, this Court reversed the lower court's finding that the school's alleged interest in avoiding "disservice to the public" outweighed the "possible irreparable damage to these … students." *Id.* at 525. See also *Book People, Inc. v. Wong*, 91 F.4th 318, 340-341 (5th Cir. 2024) (affirming preliminary injunction in compelled speech case and holding, "When an alleged deprivation of a

constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary") (quoting *Opulent Life* at 295).

This is also consistent with lower courts' finding that students suffer irreparable harm when they face retaliatory discipline for their free speech. See e.g., *Smith v. Tarrant County College Dist.*, 670 F. Supp. 2d 534, 539 (N.D. Tex. 2010) (granting TRO and finding plaintiffs faced irreparable harm by being forced to choose between exercising First Amendment rights or disciplinary action).

### F. Plaintiff Will Succeed on the Merits Regardless of Forum

#### *1) Viewpoint Discrimination Is Illegal in Any Forum*

Texas' public "colleges and universities are not immune from the sweep of the First Amendment." *Shamloo v. Miss. State Bd. of Trs.*, 620 F.2d at 521 (reversing denial of preliminary injunction) (quoting *Healy v. James*, 408 U.S. 169, 180-81 (1972)). "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Ind. Sch. Dist.*, 393 U.S. 503, 506 (1969).

In *Tinker* high school students prevailed in asserting their right to

express opposition to the Vietnam War by wearing black armbands in protest, including into their classroom and throughout the school. *Id.* It has thus already been clearly established that viewpoint discrimination in spaces such as the classroom, a professor's office, or the hallways of a university or college is illegal under *Tinker* and its progeny. See e.g., *Mahmoud v. Taylor*, 606 U.S. 522, 555-56 (2025) (reversing denial of injunction by lower court where county school board subjected students to reprimands if they expressed disfavored viewpoints, opinions, or emotional reactions to "LGBT+ inclusive storybooks"); *Gay Student Servs. v. Tex. A & M Univ.*, 737 F.2d 1317, 1326 (5th Cir. 1984) ("Perceiving college classrooms and their 'surrounding environs as a "marketplace of ideas,"' reaffirming "this Nation's dedication to safeguarding academic freedom") (quoting *Healy*, 408 U.S. at 180-81 and *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)).

"The quality and creative power of student intellectual life to this day remains a vital measure of a school's influence and attainment." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 835 (1995). The danger of "chilling of individual thought and expression …

is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Id.*

Although public universities may have a legitimate interest in preventing "substantial disruption" (here none was ever shown); the university setting requires consideration of the "special characteristics of the environment." *Healy*, 408 U.S. at 180. A school administration "cannot rely on *ipse dixit* to demonstrate the 'material and substantial' interference with school discipline." *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 970-975 (5th Cir. 1972) (reversing denial of preliminary injunction).[10] Student expression "cannot be prohibited solely because other students, teachers, administrators, or parents may disagree with its content." *Id*. at 970. "Undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression" because "[a]ny variation from the majority's opinion may inspire fear." *Tinker*, at 508.

Of course, *Tinker*, as is *Shanley*, is a K-12 case addressing the

[10] The "material and substantial" standard was articulated in *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 514 (1969) and *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966), but not quoted specifically here in *Shanley*.

speech of minors. But Supreme Court "precedents … leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. In fact, the Supreme Court has singled out law schools as places where these rights must hold special prominence:

> Law students come from many backgrounds and have but three years to meet each other and develop their skills. They do so by participating in a community that teaches them how to create arguments in a convincing, rational, and respectful manner and to express doubt and disagreement in a professional way. … A vibrant dialogue is not possible if students wall themselves off from opposing points of view.

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 705 (2010) (Kennedy, J. concurring).

In short, at TTU, this Court must address the First Amendment rights of full-grown adults training to be lawyers who must confront the messy, often vulgar reality of civil and criminal justice. This is not, in the words of Professor Patrick Metze, a "third grade schoolyard." ROA.288, ¶ 4. This is not a case, as chronicled by Manhattan Institute scholar Ilya Shapiro and others, where feral law students at elite

schools run amok and impose the "heckler's veto."[11] Fisher muzzled no one. Rather, it is Defendants-Appellees who wield the state power of Texas to muzzle only one black woman, Fisher.

Furthermore, as much as TTU tries to relabel speech as "conduct" with Latinate adverbs like "*ad nauseam*" (ROA.1219), clothing euphemisms in the trappings of dead languages does not create a new reality. Fisher's expression remains "pure speech." See *Tinker*, 393 U.S. at 505-506 ("'pure speech' … we have repeatedly held, is entitled to comprehensive protection under the First Amendment"). Above and beyond that, Fisher was even disciplined for her subjective feelings, whether vocalized or not, for committing the equivalent of thought crimes about Kirk's death. However repugnant, TTU cannot "prohibit[] … a particular expression" simply out of "'mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Tinker*, 393 U.S. at 509.

What the Supreme Court has held for grade school or high school cases applies with greater force to TTU. "[T]he First Amendment …

[11]See e.g. Ilya Shapiro, Lawless: The Miseducation of America's Elites (Broadside Books, 2025), 80-90 (discussing "heckler's veto" imposed on speakers at Yale University Law School).

does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). "The classroom is peculiarly the 'marketplace of ideas.'" *Id.* See also *MacRae v. Mattos*, __ U.S. __, 145 S. Ct. 2617, 2620-21 (2025) (Thomas, J., concurring) (noting, "It undermines core First Amendment values … to adopt an institutional viewpoint on the issues of the day and then … portray this disagreement as evidence of disruption").

Fisher expressed her viewpoints in private conversations in her professor's offices or with peers in the Clinic Office, only to have an eavesdropper run off to express disapproval to the administration, even as her own (white) students' discussed the same topic—albeit expressing the correct, favored viewpoints— loud enough to be heard across the hall by Professor Stephens. ROA.127, ¶ 46, ROA.180 (1:01:41-55). Moreover, this same conversation was taking place throughout TTU, with other students opining that Kirk would "go to hell." ROA.208, 210 (Bomar, 1:52:01; 1:55:22), ROA.129, ¶ 63. Somehow, only the black student with improper viewpoints was disciplined.

TTU cannot punish Fisher for doing nothing different than these

other (nonblack) students simply because TTU finds her viewpoints uniquely obnoxious or because Fisher might offend Republicans.[12] "[V]iewpoint discrimination violates the First Amendment regardless of the forum's classification." *Hobbs v. Hawkins*, 968 F.2d 471, 481 (5th Cir. 1992) (citing Co*rnelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 812 (1985)).

Because Defendants targeted Fisher's viewpoint and unique of all students, punished only her, the Court's analysis should end here. Defendants are liable for illegally suppressing Fisher's viewpoints and a preliminary injunction should enter.

*2) The First Amendment Cannot Be Canceled to Prevent Hypothetically Hurting Others' Subjective Feelings or Even Actually Hurting Others' Subjective Feelings*

"The existence of a hostile audience, standing alone, has never been sufficient to sustain a denial of or punishment for the exercise of First Amendment rights." *Beckerman v. Tupelo*, 664 F.2d 502, 510 (former 5th Cir. 1981). "Controversial symbolic speech, with the potential to evoke a strong and possibly violent emotional response from those who see it has time and again been held protected, even in

[12] Of course, there was no evidence that conservative students on campus were fragile or became emotionally dis-regulated by Fisher's speech.

nonpublic forums, including the classroom." *Smith v. Tarrant Cty. Coll. Dist*. at 631 (citing *Tinker*, 393 U.S. at 508-09). See also *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (holding, "speech … at a public place on a matter of public concern … is entitled to 'special protection' under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt"); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").

Here, no evidence suggests impaired work performance at TTU. This is because there was and is none. Furthermore, Morgeson's actions, not only appointing herself TTU's unofficial hall monitor, but also in sending her students home (ROA.199 (1:34:45-35:10)), caused far more disruption than Ellen Mae Fisher. No evidence suggests a single clinic client was compromised.

The School of Law claims the right to safeguard its supposedly fragile conservative students, whose opinions it prefers, from being "upset" upon hearing a black student's viewpoints, which are

intolerable to them. However obnoxious Fisher's viewpoints on Charlie Kirk may be, they are exactly the same viewpoints found to be protected in *Rankin v. McPherson*, 483 U.S. 378, 397 (1987) (finding deputy constable's celebratory utterances concerning attempt to assassinate President Ronald Reagan to be protected speech even in the workplace, where eavesdropper reported her to supervisor). Does TTU seriously maintain that the prevaricating Morgeson's retracted accusation that Fisher said, "mother fucker," in the clinic offices was somehow materially disruptive? Compare ROA.164, 170-171 (30:48-31:49, 33:15-34; 43:21-44; 45:07-33). If so, and even assuming that were true, this is the same protected speech as the student in the professional school in *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 667-668 (1973), whose "conduct," as TTU styles it, was to print an article entitled "mother f----- acquitted" and a cartoon depicting a policeman raping the Statue of Liberty.

Defendants-Appellees apparently believe they can and should shield fully adult students, who must train to be practicing attorneys, from the dyspepsia of opposing, even obnoxious viewpoints. Yet, as Fisher's fellow student Monacelli testified, all TTU has done is chill the

speech of all students, conservative and liberal, and of all races. ROA.198-199 (1:32:09-31, 1:36:08-37:12).

Unsurprisingly, here it is the suppression of free speech that encourages unprofessionalism, not Fisher's speech. Frankly, it infantilizes TTU's capable law students and tramples the First Amendment.

*3) Suppression of Fisher's Speech Is Subject to Strict Scrutiny*

Because Defendants discriminated against Fisher on the basis of her viewpoints, her subjective feelings, and emotive expression concerning Charlie Kirk's death, the Court need not reach the issue of whether Fisher's expressed herself in a public forum, a limited public forum, or a nonpublic forum. Her viewpoints are protected regardless of the forum. See *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 349-350 (5th Cir. 2001). Nevertheless, in the alternative, Ellie Fisher sets forth the standard here for protected speech in "public fora" under this Court's First Amendment jurisprudence.

In approaching First Amendment protections for student speech, the Supreme Court identifies types of forums:

[1] the traditional public forum,

> [2] the public forum created by governmental designation, and
>
> [3] the nonpublic forum.

*Chiu*, 260 F.3d at 344 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)).

Courts in the Fifth Circuit are somewhat unclear whether the first category, the "public forum," includes the "designated public forum" or whether the "designated public forum" is a subcategory of the "limited public forum" in a second category. *Justice for All v. Faulkner*, 410 F.3d 760, 765 and n.6 (5th Cir. 2005) ("precise taxonomic designation … remains elusive"). However, any strict, doctrinal delineation into three rigid categories is less relevant here than whether TTU's suppression of free speech must be subject to strict scrutiny.

The question is then whether Fisher spoke in a "designated public forum," to which strict scrutiny applies, or whether a more relaxed standard applies because she spoke in a "limited public forum." *Id*. at 765-766. In the latter, "limited public forum, the State is not required to and does not allow persons to engage in every type of speech. The State may be justified 'in reserving its forum for certain groups or for the discussion of certain topics.'" *Good News Club v. Milford Cent. Sch.*,

533 U.S. 98, 106 (2001) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). By contrast, "[d]esignated public forums are places that the government has designated for the same widespread use as traditional public forums … subject to strict scrutiny review." *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 426-27 (5th Cir. 2020).

The problem for TTU is that its policies and clinical faculty clearly designated the clinic office as an open and available forum for students to speak on controversial issues. The kind of "designated public forums" that TTU established in the clinic offices are "spaces that have 'not traditionally been regarded as a public forum' but which the government has 'intentionally opened up for that purpose.'" *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). "[T]he government creates a designated public forum only by intentionally opening a nontraditional forum for public discourse." *Justice for All*, 410 F.3d at 767 (quotation omitted).

Professor Stephens understood his office to be designated an open forum and testified to this before the TTU's Honor Council. ROA.158

(21:20). Professor Patrick Metze attested to the same. ROA.288, ¶¶ 3-4. Students confirm this. See ROA.219-220 (Gomez, 2:11:48-13:02 (sensitive topics regularly discussed in the clinic and protected by First Amendment), ROA.275, ¶ 14 (Pombrio, (consistently informed that the clinic suites are a safe environment for discussing sensitive topics); ROA.284-285, ¶¶ 5-6 (Ard (discussion in clinic was ordinary and aligned with the type of sensitive conversations that occur routinely in the clinic, considered part of the professional environment), ROA.292, ¶ 7 (Perez (clinic work room was always a shared space where students may speak freely and discuss sensitive topics, including assassination of Charlie Kirk), ROA.890-891, ¶¶ 5-14, 18 (Perez (clinic space included use of profanity, including by Professor Morgeson, and Professor Dwight McDonald joking and laughing about the death of a client). TTU's Freedom of Expression Policy also expressly designates the clinical spaces as an open forum: "freedom of expression in the Law School extends to … participating in law -related public service activities … including those related to client representation in clinical programs." ROA.317.

The one thing that was out of place on September 10, 2025 was

Morgeson's eavesdropping on colleagues and students for the purpose of reporting Fisher for saying things she did not like. But a single Professor designating themselves as some kind of volunteer informant does not suddenly close off a designated public forum.

Here, the clinical office spaces were clearly open to Fisher for exactly the kind of discussion she had on September 10, 2025 with her peers, with Metze, and with Stephens. Although this was not a traditional "public forum," the clinic spaces was no less designated by TTU for open and frank debate among students as well as between students and faculty, most especially on the specific subject matter of matters of public concern related to criminal law, such as a public murder.

This is also what any university should and must do. See e.g., *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die"). Because TTU designated the area in which Fisher spoke for the very discussions that she used the clinic offices for—speaking to her professors and to her fellow students—they are

"designated public fora." Strict scrutiny therefore applies.

*4) Defendants Flunk the Strict Scrutiny Test*

"Regulations on speech in … designated public forums are subject to strict scrutiny review—they must be narrowly tailored to serve a compelling state interest." *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020).

Clearly, a ban on one black student's expression or improper sentiments regarding Kirk's death is not only deficient on the basis of its "narrowness"; it is worse. It is simply arbitrary and capricious. As Professor Stephens testified to the Honor Council, Fisher was always ebullient, "animated person." ROA.156 (19:17). Yet, only on the day that she addressed Charlie Kirk's death did this become punishable "conduct" because her viewpoints apparently hurt others' feelings.

There is no evidence that TTU's reprimand serves any compelling state interest, because Fisher's speech interfered with no clinic legal needs or clinic work. Furthermore, TTU's reprimand only serves to punish one black woman for expressing thoughts that, however obnoxious, were being expressed throughout the law school.

There is no possible analysis in which Defendant-Appellees

survive strict scrutiny.

5) *Even if the Court Considers the Clinic Office or Professors' Offices to Be a "Limited Public Forum," Fisher Still Prevails*

The "limited public fora" is "open for public expression of particular kinds or by particular groups" and can be restricted when a speaker attempts to use it for other, more general public speech on matters of public concern. *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001); see also *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. at 829 (describing campus facilities opened to various student groups as a "limited" forum).

Even if this Court were to hold that TTU's clinical areas are a "limited public forum," the standard protecting free speech is still an exacting one. TTU may only "restrict speech in a limited public forum" if this is "(1) reasonable in light of the purpose served by the forum and (2) does not discriminate against speech on the basis of viewpoint." *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 426-27 (5th Cir. 2020).

For example, as correctly applied in the Northern District of Texas in *Ryan v. Grapevine-Colleyville Indep. Sch. Dist.,* No. 4:21-cv-1075-P, 2023 U.S. Dist. LEXIS 41478 (N.D. Tex. Mar. 13, 2023), this standard

sets a high a bar. There, the Northern District addressed a private citizen's right to hold forth about "culture war issues" at a school board meeting. Although the school board designated the meetings as open for public comment, it nevertheless restricted discussion periods to 30 minutes and restricted them to set agenda topics. *Id.* at *3-*5. Moreover, the school board forbid speakers from identifying its employees personally by name. *Id.*

Yet one citizen went off topic. He sarcastically criticized a principal and the principal's wife by name for certain Facebook photos—which no doubt caused considerably more emotional discomfort than Fisher's utterances here. *Id.* at *3-*4. The school board president gaveled the citizen into silence. *Id.* But the Court denied summary judgment to the school board for the suppression of the citizen's speech on an as-applied basis of its policy, despite the school's subsequent policy change to avoid a preliminary injunction. *Id*. at *4, *17.

As outlined above, it is clear that the only reason to suppress Fisher's speech was its content. Furthermore, in the academic setting, open discussion is professional "conduct." Applying the limited-public-forum analysis, TTU's restriction on Fisher's speech on the pretext of

"professionalism" is unreasonable in light of the forum's purpose.

Importantly, the individuals to whom Fisher spoke (including students) found nothing unusual about her speech or her actions. Upsetting, perhaps, but unusual, no. Both Stephens and Metze welcomed her interactions. The only truly disgruntled individual was an eavesdropper (Morgeson) or were told by Morgeson lurid, made-up stories about what Fisher had said (Monacelli). For their part, the conservative students Gomez and Wright testified that it was the general atmosphere they found uncomfortable, not Fisher's speech specifically. And being free from discomfort is not a sufficient interest to limit First Amendment rights. *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (holding, "speech cannot be restricted simply because it is upsetting or arouses contempt"); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").

Therefore, even if this Court were to apply the "limited public forum" standard, Defendants flunk this test as well.

### G. Fisher Suffered Adverse Action

"A plaintiff pursuing a First Amendment retaliation claim must

show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive." *NRA of Am. v. Vullo*, 602 U.S. 175, 203 (2024) (internal quotation omitted).

A student reprimand expressly targeted at Fisher's "statements" and expressions calculated to ruin her law career going forward qualifies an adverse action. See e.g., *Mahmoud v. Taylor*, 606 U.S. 522, 555-56 (2025) (reversing denial of injunction by lower court where county school board subjected students to reprimands if they expressed disapproved viewpoints, opinions, and emotional reactions to "LGBT+ inclusive storybooks"). It cannot be seriously disputed that Fisher suffered an adverse action. As addressed by the court below, the disputed issue of law is whether the harm TTU caused, without remedy, will be irreparable.

Even threatened disciplinary action will qualify as an adverse action in student speech cases. "[U]niversity students are usually immunized from suspension or other disciplinary action in retaliation for the exercise of their First Amendment rights." *Shamloo*, 620 F.2d at 521 (citing *Papish v. Board of Curators of University of Missouri*, 410

U.S. 667 (1973)).

Fisher therefore satisfies this element of a First Amendment retaliation claim.

### H. Fisher Spoke on a Matter of Public Concern

There can be no serious dispute that the murder of Charlie Kirk on September 10, 2025 was a matter of public concern. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. at 453 (quotation omitted).

Students and faculty were discussing the assassination of Kirk, and ironically it was Kirk's signature issue that campuses must be open to free debate and viewpoint diversity, exactly what TTU squelches here. This subject matter obviously addressed a matter of public concern.

TTU argues, in its words, "*ad nauseum*,"[13] that Fisher is punished for "conduct" rather than speech. But the Supreme Court has

---

[13] ROA at ##, ECF No. 44 at Page ID 1199."

repeatedly rejected conflating "conduct" and "speech." The pretense that verbal "conduct" is somehow unique and distinct from speech has been squarely rejected by the Supreme Court:

> … speech does not become conduct just because the State may call it that. Nor does … speech become conduct just because it can also be described as … anything else. The First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by "mere labels."

*Chiles v. Salazar*, __ U.S. __, 146 S. Ct. 1010, 1024 (2026) (quoting *NAACP v. Button*, 371 U. S. 415 (1963)).

This is not a case where Fisher's speech "is only one step removed from statements that [the Supreme Court] previously held entitled to no First Amendment protection even in the nonemployment context -- including assassination threats against the President …; 'fighting words'; epithets or personal abuse; and advocacy of force or violence." *Rankin v. McPherson*, 483 U.S. 378, 380, 397 (1987) (finding stating, "I hope they get him [President Reagan]" following assassination attempt to be protected speech) (cleaned up). Furthermore, TTU identifies no "conduct" other than Fisher's expression.

TTU produces perfunctory statements from administrators' averring that they considered only Fisher's alleged "conduct." This

defies the plain meaning of English words in the record. See e.g., ROA.1148 n.2; compare ROA.869 (Honor Council finding "various statements were made"; Fisher was "celebratory and made certain statements…"; "Such statements endors[ed] or celebrat[ed] death or violence," etc."), ROA.666 (Nowlin writing to Law Examiners of "celebration [i.e. words] … overheard by others" and refusal to "take responsibility or show any remorse" i.e. not submitting to compelled speech). In other words, what Defendants abhor as so-called "unprofessional conduct" is nothing more than Fisher's speech.

"History is littered with examples of official efforts to manipulate and control professional speech … in ways designed 'to increase state power,' 'suppress minorities,' and muzzle 'unpopular ideas.'" *Chiles,* 146 S. Ct. at 1024 (holding state could not restrict mental health counselor to expressing only state-approved viewpoints on "gender affirming care"). "[P]recedents have expressly rejected the State['s] … notion that 'professional speech' represents some 'separate category of speech subject to diminished constitutional protection.'" *Id.* (quoting *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018)).

In another example, over 50 years ago the Supreme Court

addressed the decorum required of "conduct" in the courtroom—a far more formal space than TTU's clinic suites at issue here. *Cohen v. California*, 403 U.S. 15 (1971). *Cohen* reversed a plaintiff's conviction under a California penal statute for "offensive conduct" after he wore a jacket emblazoned with "fuck the draft" in a Los Angeles courthouse. This expression is just as vulgar if not more so than TTU's wildest (albeit retracted) accusations about Fisher's verbal "conduct." Nevertheless, state actors could not then and cannot now simply declare speech to be "conduct" in order to suppress it because "[t]he only 'conduct' which the State sought to punish is the fact of communication." *Cohen*, 403 U.S. at 18.

Declaring over and over again that "speech" is "conduct" so TTU's university administrators can suppress it does not convert "speech" into "conduct" by some sort of word magic.

## I. The Balance of Interests Favors a Preliminary Injunction

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). Finally, in balancing harms and the public interest, the only harm here is the inability of TTU to continue

"in violation of the First Amendment, which is really no harm at all." *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021) ).

The balancing of interests overwhelmingly favors Fisher. If granted, the requested injunction will require TTU to do nothing more than maintain a vibrant law school once again rather than one that resembles a "third grade" playground, with self-anointed hall monitors who police students' and professors' free discussion of issues of public concern.

## IV. Conclusion

For the foregoing reasons, this Court should

1. Reverse the lower court's denial of Fisher's Motion for Preliminary Injunction,
2. Reverse the lower court's finding that Fisher was not irreparably harmed,
3. Find and assert jurisdiction over the expungement of Fisher's disciplinary record,
4. Enjoin Defendants-Appellees' discipline of Fisher for her protected speech, including but not limited to expunging and annulling Fisher's disciplinary record of any reprimand

or student disciplinary record related to her protected speech, and

5. Order Defendants-Appellees to so inform the Texas Board of Law Examiners and any other third parties to whom they have illegally reported their retaliatory reprimand and disciplinary action.

DATE: July 15, 2026

Respectfully submitted,

/s/Michael Thad Allen

Michael Thad Allen (435762)
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06375
(860) 772-4738
mallen@allenharrislaw.com

## Certificate of Compliance in Compliance with Rule 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **12,311** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), namely excluding the caption, Certificate of Interested Persons, Statement Regarding Oral Argument, the Table of Contents, and Table of Authorities.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in the Office 365 Suite in **14 point, Century Schoolbook font**.

*/s/Michael Thad Allen*

Dated: July 15, 2026

Michael Thad Allen, Esq.
Attorney for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify in compliance with Fed. R. App. Pro. 25(d), that I served the foregoing motion on July 15, 2026 through the Court's electronic filing system and by sending it by electronic mail to the following recipients, attorneys of record:

Daniel Ortner
Assistant Solicitor General
Office of the Texas Attorney General
Office: (512) 936-1896
Cell: (385)-242-9582
Daniel.ortner@oag.texas.gov

Wade Johnson
Deputy Chief
Special Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Office: 512-463-4139
Wade.Johnson@oag.texas.gov

/S/Michael Thad Allen
Michael Thad Allen, Esq.